Good morning everyone. We are delighted to be here in Hawaii. The cases will be called in the order listed on the docket. The first four cases Cal v. Garland, Cortez Ramos v. Garland, Orzaba Patino v. Garland, and Garcia Zuniga v. Garland have been submitted on the briefs. The first case on the calendar for argument is Intel Corporation v. Fortress Investment Group. Counsel for appellant, please approach and proceed. Good morning, Your Honor. My name is Seth Waxman. I'm representing the appellant in this case. And I too am very pleased to be in Hawaii to deliver this argument. I can't imagine why the prior four cases decided to submit on the briefs. With the court's permission, I'd like to reserve, I'm going to attempt to reserve four minutes of my time for rebuttal. Counsel, I'm sure you're aware, but please be reminded that the time shown on the clock is your total time remaining. I do. I am aware of that. Thank you. May it please the court, the district court in this case properly held that the, quote, the narrative told by the operative complaint is compelling, and that the facts alleged, quote, tend to show that super competitive prices were being charged. But the court nonetheless dismissed the complaint because it believed that Intel had not alleged sufficient facts to, quote, plausibly show that the super competitive prices were the result of patent aggregation. That was error, both as a matter of antitrust law and a matter of pleading standards. Super competitive pricing is itself direct and sufficient evidence of the anti-competitive effects of Fortress's aggregation of patents that are pricing, which is direct evidence of an unreasonable restraint of trade, raises a reasonable inference. And there is evidence, there is more evidence alleged, facts alleged in this complaint that support that inference. But what, Counsel, what are the price, prices that we're talking about here? The prices are the royalties that are demanded by the Fortress-related entities in order to be able to practice the methodology or the particular functions that are alleged in the Fortress theory. But when you say prices demanded, is that the litigation demand? So it's either a litigation demand or a royalty demand that's demanded outside without the threat of litigation. Have you, has your client alleged that you've, you've paid exorbitant royalty rates? There's no allegation that Intel has paid exorbitant royalty rates. We are not required to suffer the antitrust injury in order to bring the case, assuming, provided that we can plausibly allege that there is an appreciable risk of harm or that we have reason to believe. Is your argument that you will, you face a serious risk of paying exorbitant royalty rates? Exactly. And we, we, we demonstrate that in the complaint, or at least raise a reasonable inference that we will in two respects. One, by reference to the facts that we allege with respect to what the Fortress-related entities have done with respect to other operating companies, which have succumbed to demands in settlement of serial litigation involving substitutes. And I can detail those for the court. What's the strongest allegation in that regard that another company has had to succumb to the threat of super competitive royalties? In your complaint, what's the strongest allegation in your complaint? Let me identify one and first just start by saying that, of course, under this circuit's law in, in CONCHA, which I think is the law everywhere, that if there are facts that are relaxed, then of course what the actual settlement values are in the cases I'm about to detail for you with the relevant paragraph numbers in the complaint are very well known to the defendants. Absent discovery, we don't actually know what those numbers are, but we have a pretty good idea of the order of magnitude. Well, counsel, but under Rule 11, you have to, you can't wait for discovery to make your assertions in the complaint. Well, that's right. We're entitled to a reasonable inference that super competitive prices actually have been paid. And here's, you're asking for my best case out of a, whatever it is, a 448 paragraph complaint. I would point the court to paragraphs 68, 69, 73, 168, 169, and 182 of the complaint. These relate to an assertion by one of the Unilock entities after it had established a, in a relationship with Fortress and became part of the Fortress, the alleged Fortress related families. It asserted, these paragraphs specify how it asserted four substitute patents serially against Google and other manufacturers in the market for network based voice messaging. In the patents that, the entire Unilock portfolio of patents, all of the patents, not just the four asserted, were independently valued in 2017 at $6 million, $6.0 million. That very same year alone, they reported royalty revenues having settled some of this litigation of two and a half times that amount. And that, I think, given the constraints we have, which is absent discovery, we cannot know what the actual- You do not, you do not allege that, you cannot allege that anyone actually paid those prices. Well, no, no, no. Judge Schroeder, to be clear, in this instance, we know that some of the defendants that were the subject of serial substitute patent litigation paid, in the very year that the entire portfolio was valued at $6 million, paid $14.7 million in royalties. And the previous year, I think $7.5 million in royalties. Now, we don't know how much, for example, Google settled for, but the very fact that an entity whose entire patent portfolio was acquired for $6 million, or currently valued at $6 million, that very same year obtained litigation settlements of two and a half times that amount, just in that one year post-aggregation with the Fortress entities- Why is there, why does that create an inference of anti-competitive conduct? Well, the question, there, there is, as the judge found, there is, the judge found that there's plausible evidence that super competitive prices were being charged. Now, of course, this, your review is de novo, you can review the record and decide whether you agree with that or not. But Fortress's point is, well, all you've been able to allege are these exorbitant demands immediately following aggregation of substitute patents, and a demand is not a payment. I understand that. We are constrained in alleging what others have specifically paid, because they are all covered by protective orders, which we will overcome in discovery, but currently don't have. But what we do have- These protective orders in cases in which your client is litigating or some- No, other, other parties. These are all with respect to third parties. Now, with respect to, you know, and, and, you know, I, I just would say that I, I've given you one particular example. There are others that are specified in the complaint, and you don't have to simply relate, we're not simply relying on that. The complaint quotes Fortress's own principles in discussing what their business plan is. Their business plan is to acquire portfolios of patents in order to monetize them. That's fine. That's what patent assertant entities do. But you don't undertake the effort and the expense of accumulating substitute patents with a, with respect to a particular function, unless you intend to monetize it. And if you look, even with respect to what has been claimed against Intel, we don't, we're not, we haven't paid anything yet. So far in all of this litigation, we have won all of the cases that they have brought, with the exception of two patents, which subsequently have been declared by the patent office to be probable- I can't remember what the standard is, but in all likelihood invalid patents. So we haven't, we, Intel, have not yet succumbed to the demands. But here's what the evidence shows about us. In the market, and we've alleged this in, gee, I don't have the paragraph numbers. Well, actually, in our brief at pages 25 and 27, and the reply brief in pages 12, 13, and 15, we have alleged that VSLI, which is a wholly owned subsidiary of Fortress and under is Fortress, acquired its patent portfolio, its entire portfolio of 330-plus patents for $35 million. It immediately turned around and sued us in serial litigation on asserting 21 patents demanding $22 billion. That is a 9,000% increase in value in the turnaround. And they also, as our brief explains and cites at page 15, they have independently publicly claimed that the value of only one of those patents, the substitute that they have asserted against us in the market for MOSFET fabrication, they are valuing at $1.2 billion. So the district courts seem to get off the train by saying, well, you haven't alleged that these price increases were the result of One, for the reasons that I've detailed and we outlined in our brief, I think we have alleged enough facts that raise the more than reasonable inference that where you have an acquisition of a portfolio of patents from companies, both operating and non-operating, that have never asserted these patents, although they themselves are aggressive patent asserters, and you buy this family of patents for a song and then turn around and immediately sue with the knowledge and threat that you have substitute patents that will follow on if you don't prevail for astronomical values. I mean, I think the position with the allegation is these are actually weak patents. And so by that theory, it seems that you should be able to defend these litigations by arguing that. And it seems that your client has been doing that successfully. So the point here is our theory doesn't depend on these being weak patents. We do allege that many of these substitute patents are weak. And the fact that they can demand these astronomical values reflects the fact that they have reduced competition in the market for licensing substitute means for accomplishing the relevant functions. Judge Bress, I have a more basic answer to your question as well, which is that a plausible allegation that super competitive prices are being charged is sufficient to carry an antitrust plaintiff's burden. If those super competitive prices weren't caused by the aggregation of substitute patents, as we've alleged, then they were caused by some other anti-competitive conduct that constitutes an unreasonable restraint of trade. But why does that necessarily follow? Why does that conclusion necessarily follow? Sure. Well, as the Supreme Court explained beginning in Indiana Federation, and for that matter in Brook Group, the definition of a super competitive price is not a price that seems high. A high price could reflect intrinsic value. It could reflect a genuine innovation. A price that is super competitive, and the judge found we had plausibly alleged super competitive prices, is by definition, by this very definition, the product of a violation of the antitrust laws. It is a direct evidence of an unreasonable restraint of trade. Now they say maybe we haven't sufficiently alleged it's because of aggregation of substitutes. We think we have, but even if we haven't, it just means that they've engaged, they have plausibly engaged in some other conduct that violates section one of the Sherman Act and section seven of the Clayton Act. I mean, how much of this theory, I know you're willing to reserve some time, I'm sure. Oftentimes. I'm quaking now seeing that I'm talking two minutes and three seconds. Let me ask, I mean, the district court thought the theory was compelling. Is it though? Because I'm sure your answer is yes, but I'll tell you my concern with it, which is that it seems to depend on sort of the failure of the judicial system. The argument here is that there are a bunch of very weak patents being asserted, and that some of these are going to sneak through, we're going to be tagged with a huge verdict, and that there's not going to be sufficient protection on the back end for that. But if the judicial system works as it's supposed to, and if the patent office works as it's supposed to in finding bad patents invalid, is this really a compelling theory? So we think it is a compelling theory. All we have to show is that it is a plausible theory backed by plausible allegations that raise a reasonable inference. I think it is basically for two reasons. Number one, the ability to essentially present a series of patents, which given the complexities of modern information technology, and the breadth and ambiguity of patent claiming, and the opacity in the ownership of the relevant substitute patents, the ability to say we're suing you for, we think you're infringing this patent. If we don't win, we have another substitute patent, and we have another one, and we have another one. Now, my friend on the other side has said, well, we haven't alleged in our complaint particular threats, specific threats by Fortress that that's what we're going to do. The reason that we haven't is we are precluded by a nondisclosure agreement. But in addition to, Judge Bress, the fact that the ability to threaten serial litigation, serial incredibly expensive litigation, not only in terms of the money costs of defending it, but the time and effort of the company's engineers, et cetera, in defending it, above what would exist if there were truly a competitive market for licensing substitute technologies that could be implemented. And I guess the second point that I would make is, let's even assume that that's not a sufficient answer for your honor. In patent litigation, the patent statute says that if you prevail in an infringement action, you're entitled to an award not less than what the reasonable royalty would be. If you have a plaintiff, I mean, the best evidence of damages in a patent action, assuming there's a finding of liability, is there are substitute technologies available that are covered by other patents, and I could license a substitute patent for, I don't know, $50,000. If the plaintiff is controlling substitute patents, you're not going to have that evidence. So you not only have the value jacked up by the threat and prospect of never ending litigation or seemingly never ending litigation over substitute patents, you have the very direct impact of the reduction of a competitive marketplace through the acquisition of substitutes, just as you would have if in the context of a merger of previously competing companies. Right, but at this point, if I may, at this point, you haven't alleged that you've been your clients unable to practice any technology or that you've been unable to get access to a substitute patent. That hasn't happened yet. Right, and the answer is we don't have, antitrust laws don't require us to take the blow and suffer the consequences if we can plead an appreciable risk of harm, and what we've said is we know what they are at, what they're threatening us with. We know the astronomical royalties that they are demanding. We haven't succumbed yet. Instead, we filed this lawsuit, which has shut down this practice that Fortress has engaged in, at least with respect to Intel, completely during the pendency of this lawsuit, but we know what has happened with respect to other big operating companies like Google. They have done this, and royalties and settlements have been made. We have not direct evidence of the amounts of the settlements, but we have every reason to believe, and I gave you the Unilock example in the first instance, that they bear no relation to the intrinsic market value of a particular patent asserted. Council, I think Jess Schroeder had a question. I'm sorry. I just want to make sure that I understand that there's nothing illegal about aggregating patents. There's nothing illegal about aggregating patents in general. That's what patent assertion entities do. What makes it a violation of Section 1 of the Sherman Act and Section 7 of the Clayton Act is the aggregation of substitute patents with respect to a particular function which either eliminates or substantially suppresses competition in the licensing market for that function. That's what makes this a plausible antitrust violation, not the fact that they have a huge portfolio of patents like patent assertion. Did the district court accept your definition of the substitute patent market? Well, what the district court said, you've plausibly alleged substitutes in each of these markets. You have also, following the district court's narrowing of the markets alleged, you've also alleged other patents that what you call complements or possibly substitutes. I'm not going to consider those substitutes. We think that was error, but it doesn't really matter for purposes of argument. Let me ask you this final question, then we'll hear from the other side, and I'll give you some time for rebuttal. So you're saying that the price in this case is defined by the litigation demand? We have to have a price. The price that was charged has to be super competitive, and I had difficulty discerning what you allege the price actually is. Right, so we don't dispute that a price charged is a price that's actually agreed upon and paid. I can say to you, Judge Rawlinson, I have a beautiful vintage car. It doesn't run that well, but I'm going to sell it to you for $3.5 million, and you can say, I'm not buying it. If I say to you, if I make you an offer with an exorbitant price and there just aren't a appreciable number of other cars to compete with. That's not the question I'm asking. Oh, I'm sorry. I'm asking you the question, how is price defined in your allegation? What is the definition of price? The definition of price is an amount that is demanded and either paid, or it can be plausibly alleged will have to be paid. And our case, since we haven't paid anything yet, our case is in light of their entire business plan and the theory behind their business plan and what they have done with respect to other operating companies. We know how this ends if we can't end this litigation, which is, we are going to have to pay a royalty. That's a long answer for what the definition of price is. But what I want to ask you is, what case supports the proposition that if no amount has been demanded, that the price is an anticipated amount that would be demanded? What case supports that proposition? I have not found a case, Judge Rawlinson, going either way on this point. It is an undisputable fact that a demand is not a price. It is also an undisputable fact that an allegation that there is a demand, the demand is vastly beyond any royalty that could be requested in reasonably competitive market. And that there is, that by virtue of the acquisition of alternatives, that something like that super competitive price will have to be paid in order to essentially practice the invention and avoid decades of serial litigation over asserted substitutes. So you're actually asking us to redefine price for purposes of antitrust law? No, I'm saying, I want you to define price exactly the way that I think you're trying to get me to admit, and I think I'm trying to admit over and over again. I'm not asking you to admit anything. I'm trying to figure out how your definition of price fits within the precedent that has been established in antitrust law. Right. Here's our point. We agree that a price is something that is paid or agreed to be paid, demanded, and then paid, either enforced by a judgment or pursuant to a settlement or a negotiation. We don't have that with respect to us yet. You have not paid anything. We have not paid anything with respect to fortress or fortress entities in these markets, but we have a reasonable apprehension based on what they're demanding and what they have done in accumulating substitute patents that read on technology that we are locked into and what they have done with respect to other operating companies, that absent relief from this court, we will have to pay those prices. We have at least an appreciable risk of harm, which is the relevant legal scheme. All right. Thank you, counsel. Thank you. We've taken you way over time. I have taken so many words to explain this. We helped you go over your time, so we'll give you a couple of minutes for rebuttal. Mr. Waxman and I have known each other for many years, have co-represented parties. We've been on the opposite side, and we've also worked together on non-profit activities together. All right. Yes, exactly. So if you could just introduce yourself for the record. The record doesn't recognize you, but we do. Thank you. May it please the court, on behalf of the appellees, Morgan Chu, and with me are my partners to my immediate left, Michael Harbert and Matthew Ashley. There are many independent reasons why Intel's third attempt to plead an antitrust case fails. I want to focus on just three and make a fourth overarching point. First, the theory that Intel chose was based on super competitive pricing, not demands in litigation or anything else, and they have failed to allege prices. Second, Intel's theory depends upon an alleged aggregation of substitute patents, but Intel has failed to plead facts explaining or supporting why buying one patent or a group of patents, or for that matter many patents, would be an antitrust violation. It's the absence of facts being pledged. Third, Intel has not pledged facts to link the aggregation of substitute patents with the super competitive pricing. You would think that they would have to show some cause and effect, but they have not alleged any facts. Here's the fourth point, which is an overarching point. As noted already by this court, Intel has alleged the patents are weak, but they didn't stop there. They said that they are easily designed around, that they have questionable validity. Intel also failed to allege that Fortress had refused to grant the license. Intel didn't even plead that it ever asked for a license. Intel didn't plead that it couldn't make a product or practice a technology because of any Fortress patent whatsoever. Intel failed to plead that anyone else had requested a license from Fortress or a Fortress entity and was denied a license. Counsel? Yes. What's your response to opposing counsel's position that the litigation demands that were made and the resultant increase in the value of the patents is a sufficient representation of super competitive prices? Let me address both parts of that. Litigation demands are not prices. The Third Circuit in in-ray baby foods directly addressed this question. It was an antitrust case against manufacturers of baby foods, and the plaintiffs, the purchasers of the baby foods, said, well, we're relying on list prices. And the appellate court says, well, wait a minute, wait a minute. You can't base your case on list prices, which are not being paid by anyone. You have to base it on actual prices. With respect to the second part, Intel itself has pleaded itself out of this case because in its pleadings it had set forth numerous reasons, alternative explanations, obvious explanations as to why a patent or a group of patents in the hands of one owner, an XP, may lead to a different circumstance when there's another owner. What did they plead? Well, there's the risk of a countersuit by Intel. There's the risk that the company may lose customers or suppliers. There's the risk of exclusion from collaborative industry initiatives or associations, and there's the potential of reputational harm. Those are allegations that Intel put into its pleadings to explain why the value of a patent may change when they change hands. In addition, everyone in this courtroom knows that litigation is a very risky business. Someone could invest many millions of dollars in pursuing a patent infringement case and pursue it for three or four or five years and come up absolutely empty. So, it would be a commercially sensible, reasonable arrangement for a patent donor under certain circumstances to say, I don't want to take those risks and I will transfer the patent to someone else. Counsel, can I ask you, my colleagues may be very familiar with this area, but I'm not. Is your client basically in the business of aggregating patents? No. Fortress, it's an investment company and they represent various funds, persons who will invest, and they include Texas A&M, Texas State Teachers Union, and other similar parties who will invest in the particular funds. They have a Fortress Sanity, in particular VLSI, has been involved in buying patents and asserting them against Intel, but it is a handful of patents that have been asserted against Intel. Indeed, of the four markets that Intel chose to define, VLSI only owns one patent in each of those markets and in one of those markets never asserted that patent. Well, I understand we don't know how many patents there are out there, but I'm just trying to understand if your client aggregates these patents and has multiple patents, but it's not in the business of producing anything. It must do that. It's doing that for the purpose of suing other people who maybe want to use those patents. Is that the reason for it? Or licensing the patents. So, there are many non-practicing entities. Universities are a good technology to stay on their shelf. Maybe they can cause someone to start a company based on those new technologies, but they're usually not wanting to be in the business of enforcing patents. So, sometimes they will transfer the risk to someone else for consideration. So, those are just examples of the kinds of transactions that take place. Council, I don't think you answered the second part of my question. You were going to when you were going to explain your response to opposing counsel's observation that these litigation demands, exorbitant litigation demands manifested into super competitive prices. What's your response to that? Super competitive prices in the parlance of antitrust laws must mean something more than high prices. So, it must be something that was caused by anti-competitive conduct. That's a failure on the pleadings for Intel. What Intel tried to do... Your position is that if we accept the allegations in the complaint is true, that these patents were aggregated such that there were no reasonable substitutes and then exorbitant royalties were demanded, that would not be a super competitive price. Well, that's not really quite what the allegations are. There's the conclusory allegation that there are super competitive prices, but they don't allege facts about prices. Put that aside for the moment. They don't allege facts that the supposed super competitive prices were tethered to the aggregation of substitute patents. And then on the substitute patents, there are no factual allegations about how many substitute patents there are. There are no allegations about what fraction in a rough sense or the quality in a broad sense of the alleged substitute patents that BLSI or Fortress entity controls. In other words, are you arguing that there were no allegations of market power? Is that what you're arguing? Yes, but I would be more particularized in that because if you take the three basic issues I raised today, the super competitive prices, there were no plausible facts alleged beyond the conclusory statement of super competitive prices. There were no plausible facts that went beyond the conclusory statement that there was an aggregation of substitute patents. And there was no statement of or pleading of facts tethering the alleged super competitive prices to the aggregation of patents. Yeah, but if I could try to tie this together a little bit, the whole point of your business is to aggregate the patents so that you can make as you can out of the licenses, right? It's based on the individual patents. So let me give you an example in our particular case. We heard Mr. Waxman say, well, there's information he doesn't know. Well, so they said, I want to get the protective orders in particular cases lifted. So a judge in Delaware said, okay, I'll lift the protective order for you. And what happened? They looked at the expert report for damages and there is not one whiff or hint that the reasonable royalty analysis was related to anything more than the particular patent or patents in suit. There was no hint. But I was asking you about the point of aggregating all these patents, not a particular patent, but the aggregation is in order to make your target as broad as possible, I guess, so that you can get higher royalties. Isn't that the point of it? The answer is no. The damages in patent litigation is per patent. So putting two patents together doesn't make any difference. In addition, in this particular circumstance, NXP has a very large patent portfolio, a very small portion was sold to VLSI, and that amounted to a disaggregation of patents. There was no showing at all of any harm to Intel by the transfer of particular patent assets from NXP to VLSI or any other fortunes entity. Are you saying that your client is not in the patents? Correct. They did acquire patents and if they were in the business, according to the actual allegations, somehow they haven't done a very good job because there's one VLSI patent only in each of the four markets that Intel defined. So if aggregation is by one, I suppose that could be an aggregation. Why would the district court think that there was a plausible claim alleged of aggregational substitute patents? Why would the district court come to that conclusion if it's clear that there is no aggregational substitute patents? In part of the district court's opinion, he, Judge Chen, a very experienced district judge, assumed the theory but then went on to say Intel failed to plead actual facts that supported its own theory that the super competitive prices were the result of patent aggregation. But the district court did not say that the plaintiff failed to plead the existence of the aggregational substitute patents. No, the district court, we have to separate a conclusory statement as Trombley does. So the district court recognized the conclusory statement that there was a supposed aggregation of substitute patents. But then the court does not have to recognize the purposes of pleading a conclusory statement. That's right. But the district court in this case appeared to conclude that this was a plausible allegation. It was assuming in its discussion it wasn't accepting that theory, but it found assuming Intel's theory that actual facts that supported its theory were the result of patent aggregation. Indeed, the district court went on to say there was a complete absence of any allegations of fact tending to show that the super competitive prices resulted. Reviewers, do you think Intel adequately alleged aggregation in any of these markets? No. Why do you say that? Well, remember there are three motions to dismiss. Tell me some details, tell me some facts, put it into your pleadings about the numbers, roughly the numbers, or the importance of the patents. At one point, the district court said to Intel's counsel, tell me that these are patents that are crown jewels and somehow that maybe could lead to some kind of antitrust claim. Instead, Intel's counsel on round three decided to just stand on the pleadings, not add any additional facts, despite many pleas from Judge Chen for them to do so. And that, of course, runs directly afoul of the holding of Trombley and other cases by the Supreme Court. It's not the number of patents, it's the importance of the patents. If there are then that kind of captures the marketplace. So it's not the fact that the patents are few in number, it's whether or not they capture the technology that has to be relied upon. I would agree in a hypothetical, you can have a small number of substitute patents and let's just suppose there are no other substitute patents to practice some important technology. Let's also assume, contrary to Intel's pleadings, that these are patents not easily designed around. One of the flaws of Intel's pleadings is there can be five, ten, hundreds, or thousands of other substitute patents. But Intel could not in any of its pleadings point to a single instance where they wanted to provide a certain functionality, where they wanted to have a certain feature in any Intel product, and that somehow they were prevented from doing so because they couldn't access any substitute patents. They admit that others, other than in their pleadings, they admit that there are other owners of substitute patents for the markets that they define, for all four of the markets. You're not suggesting though that Intel is unreasonable in fearing that by this aggregation you're going to come after them and sue them for infringement, seriatim, at great expense. I think they are. You think that's an unreasonable fear? I think it is an unreasonable fear. You're not going to do that? I can't tell you what some future decision may be, but they couldn't point by alleging any facts that any statement was made. With serial litigation, they could say, oh, for three of the markets they were sued by one patent and only one patent, and they couldn't even point to a second VLSI patent in any of those. And it would not be sufficient for them to speculatively make up a subjective fear that they might get sued again in the future. I wanted to correct a couple of statements made by my esteemed counsel on the other side. He made some statements about Unilock. Well, Unilock is no longer a defendant. Unilock has never sued Intel. So whatever those statements were, they seem to be really off the point altogether. The fundamental complaint in a broad sense of lose a patent infringement case before a jury and then not get it overturned by the district court and not get it overturned by the federal circuit. That's just a fact of garden variety patent litigation. If the damages claimed are not consistent with patent law, then that would be a very strong appeal point. We think that Intel has had three tries at pleading an antitrust case and has failed to do so. Thank you very much. Thank you, counsel. Let's put two minutes for rebuttal. Thank you. Let me first address the issue of the substitute patents that have been asserted so far when we essentially stopped this train by filing this litigation have all been asserted by VSLI and VSLI acquired a portfolio that had already aggregated substitute patents. That may be all true, but just as with respect to the facts that I pointed the court to that are alleged with respect to the Unilock 217, it was the aggregation of VSLI's portfolio with the portfolios controlled by Inventorgy and the IXI and the other entities that we have alleged Fortress, the investment company, has negotiated agreements with so that in total as a conspiracy, as a group, there are multiple substitute patents that can be alleged. The notion that we have not, my friend says, we have not adequately shown that the substitutes that were aggregated were material. Who knows? Maybe there are 10 other substitutes that we could go for. Number one, the fact that super competitive prices are charged, and Judge Rawlinson, in my last 30 seconds, I'll go back to this point. The fact that they are charged is proof positive that there is an unreasonable restraint of trade. We have plausibly alleged that it derives from the elimination or reduction of substitutes so that prices above a competitive range can be charged. We have alleged facts showing that although we haven't had to pay them and we haven't yet been able, not been able to design around other companies in our position facing serial litigation by Fortress entities of substitute patents have, and we have certainly plausibly alleged that there is no reason on God's green earth that Fortress and the Fortress entities, if left unconstrained, won't do the same thing with respect to us. Finally, in my last 14 seconds, I'll just say... Well, you're all the time action. Oh, I'm sorry. Okay. Well, I beg the court's indulgence then. No, go ahead. Oh, I was just going to say, my friend, Mr. Chu says, well, we've never alleged that Fortress ever refused to license a technology to anybody. We have pleaded in the complaint with statements from Fortress's own principles. Their business plan is to not only not offer to license in the ex-ante market, but to obscure through multiple layers of shell companies, their ownership of these substitute patents. Their plan is to, as they say, wait until a manufacturer is locked into a technology and then come in and say, aha, we've got multiple patents which read on the way that you are currently achieving this function and substitutes. And therefore, your option for going and designing around in the market is sufficiently constrained that although it's true that we paid $35 million for 330 patents, we're demanding $1.2 million for a license for a particular patent and $22 billion for a license for 21 alleged patents. Thank you. I appreciate the court's- Thank you, counsel. Thank you to both for your helpful argument in this challenging case. The case just argued is submitted for decision by the court.
judges: SCHROEDER, RAWLINSON, BRESS